PD-0460-15

RECEIVED
IN COURT OF APPEALS
ELEVENTH DISTRICT

JUN 2 3 2015

SHERRY WILLIAMSON, CLERK

No._____

# In the
# Supreme Court of Texas

RECEIVED IN
COURT OF CRIMINAL APPEALS

June 26, 2015

ABEL ACOSTA, CLERK

Joseph Levy,
    Petitioner,

v.

The State of Texas,
    Respondent.

From the 11th Court of Appeals, Cause No.11-13-00048-CR,

And the 16th District Court for Denton County,

Cause No. F-2012-0885-A, Honorable Sherry Shipman Judge

# Petition for Review

Petitioner's Name:  Joseph Levy 01833936
Petitioner's Address: Clements Unit
                9601 Spur 591
                Amarillo, TX, 79107
Petitioner's Telephone:  _____

Petitioner's Fax:  _____

Petitioner's e-mail:    joseph.m.levy@gmail.com

FILED IN
COURT OF CRIMINAL APPEALS

June 26, 2015

ABEL ACOSTA, CLERK

## IDENTITY OF PARTIES AND COUNSEL

The following constitutes a list of all parties to the trial court's final judgment and the names and addresses of all trial and appellate counsel:

Petitioner's name

      Joseph Levy

Petitioner's trial counsel's name, address, telephone and fax (if applicable)

      Craig Price

      1660 Stemmons Fwy # 300
      Lewisville, TX

      (972) 436-9300

Petitioner's appellate counsel's name, address, telephone and fax (if applicable)

      Don Bailey

      309 N Willow St
      Sherman, TX 75090

      (903) 892-9185

Respondent's name

      The State of Texas

Respondent's trial counsel's name, address, telephone and fax (if applicable)

Respondent's appellate counsel's name, address, telephone and fax (if applicable)

      Charles E. Orbison, Assistant
      District Attorney's Office
      Denton County
      P.O. Box 2344
      Denton, TX 76202
      Catherine Luft, Assistant
      Denton County District Attorney's Office
      P. O. Box 2344
      Denton, TX 76202

**TABLE OF CONTENTS**

|  | Page |
|---|---|
| IDENTITY OF PARTIES AND COUNSEL | i |
| INDEX OF AUTHORITIES | iii |
| STATEMENT OF THE CASE | iv |
| STATEMENT OF JURISDICTION | v |
| ISSUES PRESENTED | v |
| STATEMENT OF FACTS | 1 |
| SUMMARY OF THE ARGUMENT | 2 |
| ARGUMENT AND AUTHORITIES | 3 |
| PRAYER FOR RELIEF | 4 |
| APPENDIX | 5 |

Page ii

# INDEX OF AUTHORITIES

**Cases, statutes and other authorities**                                    **Page**

Strickland v. Washington, 466 U.S. 668 (1984)                                    3

# STATEMENT OF THE CASE

## Nature of the Case

The jury found Joseph Levy guilty of one count of indecency with a child

and two counts of aggravated sexual assault. The victim was his daughter, C.L.,

Who was under the age of fourteen. The jury assessed punishment for the

Indecency-with-a-child conviction at confinement for six years, for the first

aggravated sexual assault conviction at confinement for thirty years, and for the

second aggravated sexual assault conviction at confinement for thirty-five years.

The trial court sentenced him accordingly and ordered the sentences to run

consecutively.

## Trial Court Information

Trial Court Judge:        Rivera-Worley, Carmen

Trial court name/number:  16th District Court

Trial Court County:          Denton

Trial court ruling:         Guilty on all three counts

## Court of Appeals Information

### Parties in the Court of Appeals

All Appellants:          Joseph Levy

All Appellees:          The State of Texas

Other parties:          _____

### Information about the Court of Appeals

Court of Appeals Number:    11th

Justices deciding appeal:    JIM R. WRIGHT

                           CHIEF JUSTICE

                           MIKE WILLSON

                           JUSTICE

                           JOHN M. BAILEY

                           JUSTICE

Author of court's opinion:    Wright Chief Justice

Author of any separate opinion:    _____

Citation of opinion, if published:    _____

Ruling of Court of Appeals:    Affirmed no error on lower court judgement

## Motions for Rehearing

Was a motion for rehearing filed?  Yes

If filed, how did Court rule?      Denied motion for new trial

Was a motion for reconsideration en banc filed? No

If filed, how did Court rule?      _____

(use additional sheets if necessary)

Page iv

## STATEMENT OF JURISDICTION

The Supreme Court has jurisdiction pursuant to the following subsection(s) of Texas Government Code section 22.001(a): (circle the subsection(s) that apply):

(1) (disagreement among justices of court of appeals on question of law material to decision)

(2) (conflict between holding of court of appeals and another court on question of law)

(3) (construction or validity of a statute)

(4) (a matter involving state revenue)

(5) (a case in which the railroad commission is a party)

(6) (an error of law has been committed of importance to the jurisprudence of the state)

## ISSUES PRESENTED

1. I am bringing forward the motion to amend the indictment it was done right before trial started and I was not given the proper 10 days required to discuss and be made known to my rights pertaining the amending of the indictment.

2. I am bringing forward that I did not have adequate representation (1) The lawyer did not investigate the prior false allegations or speak to the prior lawyer that dealt with that case (2) The lawyer didn't interview key witnesses like the counselor I had been seeing (3) The lawyer didn't in any way communicate other then while in the court room and he didn't discuss any of the strategy or reasons behind doing certain things when he was asked.

(use additional sheets as necessary)

Page v

## STATEMENT OF FACTS

When Appellant and C.L.'s mother divorced, C.L. lived with her mother and grandmother, R.E.S. When C.L. was five years old, her mother died from complications after surgery. C.L. then began living with Appellant, and Appellant refused to allow visitation between C.L. and R.E.S. After R.E.S. picked C.L. up from school one afternoon, C.L. told R.E.S. that she had learned how to make a baby and that Appellant "had masturbated in front of her naked to show her what babies were made of." C.L. was removed from Appellant's home and placed with R.E.S., but as part of an agreement in which R.E.S. was granted custody of C.L., R.E.S. signed a statement reflecting that she did not believe C.L.'s allegations against Appellant. R.E.S. obtained custody of C.L. in March 2004. After a bench trial, Appellant was acquitted of the charges that stemmed from those allegations. R.E.S. and C.L. had no contact with Appellant until October 2009 when R.E.S. sued Appellant for back child support. When Appellant appeared in court, he brought his wife Jackie and their one-month-old son. Because C.L. had always wanted a sibling, R.E.S. invited the Levys to attend C.L.'s orchestra concert that night so that C.L. could meet her brother. After reconnecting, C.L. began spending a lot of time with the Levys. In January 2011, C.L. moved to Addison to live with the Levys.

The record contains evidence that in the following summer, as C.L. played a computer game, she commented that her back hurt; Appellant asked C.L. if she wanted a massage. Appellant told C.L. that he would leave the room and that she

could "strip down to [her] bra and underwear, take off however much [she would] like to," and cover her backside with a blanket. C.L., wearing only her underwear and covered with a blanket, lay down on the couch. Appellant returned and began massaging C.L.'s back. He asked C.L. to take off her underwear "[b]ecause he wanted to get to a muscle." After C.L. removed her underwear, Appellant "stuck a finger inside of [her] and licked it and went, 'Eww, you taste good.'" Appellant told C.L. that she needed to "keep up hygiene down there" and should shave her pubic hair but that he "wanted [her] to leave a strip" of hair.

At the end of the summer in 2011, the Levys moved to The Colony, and Appellant's massages became a common occurrence. One night after Appellant and Jackie fought, Jackie left. Appellant later went into C.L.'s room and told her "that it would be the only time [they] had for a long time and so he wanted to give [C.L.] a massage." Appellant wanted to use massage oils but did not want Jackie to know, so he instructed C.L. to lay one of her blankets on his bed. Appellant took off his boxer shorts because he did not want to get massage oil on them either. Appellant straddled C.L., who was lying facedown, and began massaging her back. Appellant's penis was touching C.L.'s buttocks, and when she asked him to move, Appellant pretended that he did not realize that he was touching her. Appellant told C.L. to roll onto her back; he massaged her breasts and digitally penetrated C.L.'s vagina. Appellant then got on his knees, put C.L.'s legs over his shoulders, and "started licking [her] vagina." C.L. told Appellant that she did not like that and that she wanted him to leave her alone. Appellant told C.L. that she "seemed

to like stuff inside of [her] more than outside," and Appellant got a "glass dildo." C.L. told Appellant that she did not want to use the dildo and that she wanted to go take a bath. Appellant said, "Come on. It's a waste of water. Just come take a shower with me." After the shower, C.L. slept in her own bed that night even though Appellant had "begged" her to "come spend the night with him."

In September, Jackie gave birth to the couple's second child. Jackie spent three days in the hospital. On one of those nights, Appellant and C.L. had dinner at home, and after dinner, Appellant asked if he could give C.L. a massage because they "may not have a chance for a long time." Appellant told C.L. that Jackie had not been fulfilling him sexually since she became pregnant. After C.L. told Appellant three times that she did not want a massage, she ultimately acquiesced. C.L. testified that Appellant "did the normal massage stuff at first," and she clarified that she meant that Appellant massaged her back, touched her vaginal area with his mouth and fingers, and "put his fingers inside of [her]." Afterward, Appellant told her to take a shower with him; she did, and she also slept in Appellant's bed that night. C.L. wrapped herself in a blanket on Jackie's side of the bed before she went to sleep. However, when C.L. woke up, she was not wrapped in the blanket. Appellant had one hand inside her underwear touching her skin, and Appellant's other hand was moving under the blanket near his "penis area." C.L. asked Appellant what he was doing, and he pretended that he had been asleep. Appellant told C.L. that he and Jackie "had full sex sessions" and that he does "stuff like th[at] in [his] sleep all the time."

C.L. testified about another occasion when she and Appellant were lying on the bed in the master bedroom and Appellant said, "Nipples are so weird. You can punch them, and they get hard. You can lick them and they get soft." C.L. said that Appellant then "performed those acts." The last sexual encounter with Appellant that C.L. remembers occurred on an occasion when Jackie had left the house to pick up food. Appellant asked C.L. if she wanted a quick massage and told her to take off her shirt, and C.L. told him "no" because Jackie would not be gone long. C.L. testified that Appellant "let [her] go on that one and just massaged [her] breast and back, and then Jackie came home."

In January 2012, C.L. told her teacher about the abuse. After the teacher contacted authorities, C.L. was interviewed at the Child Advocacy Center, examined by a sexual assault nurse examiner (SANE), and returned to R.E.S.'s custody. Appellant gave a statement to the officers at The Colony Police Department, and they obtained a search warrant. Several items described by C.L. were seized, including two dildos, shower sponges, lotion, and C.L.'s polka-dotted blanket that she put on the bed during a massage. The blanket had a floral scent that was consistent with the smell of the massage oil found in the home. The officers also took pictures and used an alternative light source that significantly enhanced images of bodily fluids. Lieutenant Darren Brockway testified that he saw more bodily fluid in Appellant's home than he would normally see. Officers seized the sheets on C.L.'s bed, the mattress cover from the bed in the master bedroom, and three couch cushion covers because the alternative light source

indicated the presence of bodily fluids on those items. Testing revealed the presence of semen on the master bedroom mattress cover, but DNA testing showed that C.L. was excluded as a contributor.

(use additional sheets as necessary)

Page 1

## SUMMARY OF THE ARGUMENT

The appeal court based their decision that there was no errors during the trial proceedings or the motion for new trial and that all evidence was sufficient to affirm the appellants convictions.

(use additional sheets as necessary)

Page 2

## ARGUMENT AND AUTHORITIES

The argument that inadequate counsel had been brought forth in this they affirm that they see no reason to believe that there was inadequate counsel. I bring forth the fact that there was indeed inadequate counsel (1) the lawyer didn't investigate prior allegations of false acquisition or talk to the lawyer that was over that case Strickland v. Washington, 466 U.S. 668 (1984). (2) The lawyer didn't interview key witnesses like the counselor that I had been seeing, that could have been a expert witness and could of possible changed the out come of the trial. (3) The lawyer didn't in any way communicate other then while in the court room and he didn't discuss any of the strategy or reasons behind doing certain things when he was asked. Right before trial started the State requested to change the indictment. I am bringing forward the motion to amend the indictment it was done right before trial started and I was not given the proper 10 days required to discuss and be made known to my rights pertaining the amending of the indictment.

(use additional sheets as necessary)

Page 3

## PRAYER FOR RELIEF

Appellant prays that this court grant his petition for discretionary review and upon reviewing the judgment below they will reverse, this case and dismiss the prosecution or enter it in for retrial.

Respectfully submitted,

*Joseph M. Levy*
Signature of pro se party

## CERTIFICATE OF SERVICE

I certify that a copy of this Petition for Review was served on Respondent Joseph Levy by U.S. Mail on the following date: 06/19/2015.

*Joseph M. Levy*
Signature of pro se party

(use additional sheets as necessary)

Page 4

**APPENDIX**

TAB

1      Judgment or order challenged on appeal

2      Opinion of Court of Appeals

3.     Judgment of Court of Appeals

(use additional sheets as necessary)



In The

# Eleventh Court of Appeals

_____

## No. 11-13-00048-CR
_____

**JOSEPH LEVY, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 16th District Court**
**Denton County, Texas**
**Trial Court Cause No. F-2012-0885-A**

## M E M O R A N D U M   O P I N I O N

The jury found Joseph Levy guilty of one count of indecency with a child and two counts of aggravated sexual assault. The victim was his daughter, C.L., who was under the age of fourteen. The jury assessed punishment for the indecency-with-a-child conviction at confinement for six years, for the first aggravated sexual assault conviction at confinement for thirty years, and for the second aggravated sexual assault conviction at confinement for thirty-five years. The trial court sentenced him accordingly and ordered the sentences to run

consecutively.  In two issues, Appellant contends that he was deprived of his right to effective assistance of counsel and that the trial court erred when it admitted the report of a sexual assault nurse examiner.  We affirm.

When Appellant and C.L.'s mother divorced, C.L. lived with her mother and grandmother, R.E.S.  When C.L. was five years old, her mother died from complications after surgery.  C.L. then began living with Appellant, and Appellant refused to allow visitation between C.L. and R.E.S.  After R.E.S. picked C.L. up from school one afternoon, C.L. told R.E.S. that she had learned how to make a baby and that Appellant "had masturbated in front of her naked to show her what babies were made of."  C.L. was removed from Appellant's home and placed with R.E.S., but as part of an agreement in which R.E.S. was granted custody of C.L., R.E.S. signed a statement reflecting that she did not believe C.L.'s allegations against Appellant.  R.E.S. obtained custody of C.L. in March 2004.  After a bench trial, Appellant was acquitted of the charges that stemmed from those allegations.

R.E.S. and C.L. had no contact with Appellant until October 2009 when R.E.S. sued Appellant for back child support.  When Appellant appeared in court, he brought his wife Jackie and their one-month-old son.  Because C.L. had always wanted a sibling, R.E.S. invited the Levys to attend C.L.'s orchestra concert that night so that C.L. could meet her brother.  After reconnecting, C.L. began spending a lot of time with the Levys.  In January 2011, C.L. moved to Addison to live with the Levys.

The record contains evidence that in the following summer, as C.L. played a computer game, she commented that her back hurt; Appellant asked C.L. if she wanted a massage.  Appellant told C.L. that he would leave the room and that she could "strip down to [her] bra and underwear, take off however much [she would] like to," and cover her backside with a blanket.  C.L., wearing only her underwear and covered with a blanket, lay down on the couch.  Appellant returned and began

2

massaging C.L.'s back. He asked C.L. to take off her underwear "[b]ecause he wanted to get to a muscle." After C.L. removed her underwear, Appellant "stuck a finger inside of [her] and licked it and went, 'Eww, you taste good.'" Appellant told C.L. that she needed to "keep up hygiene down there" and should shave her pubic hair but that he "wanted [her] to leave a strip" of hair.

At the end of the summer in 2011, the Levys moved to The Colony, and Appellant's massages became a common occurrence. One night after Appellant and Jackie fought, Jackie left. Appellant later went into C.L.'s room and told her "that it would be the only time [they] had for a long time and so he wanted to give [C.L.] a massage." Appellant wanted to use massage oils but did not want Jackie to know, so he instructed C.L. to lay one of her blankets on his bed. Appellant took off his boxer shorts because he did not want to get massage oil on them either. Appellant straddled C.L., who was lying facedown, and began massaging her back. Appellant's penis was touching C.L.'s buttocks, and when she asked him to move, Appellant pretended that he did not realize that he was touching her. Appellant told C.L. to roll onto her back; he massaged her breasts and digitally penetrated C.L.'s vagina. Appellant then got on his knees, put C.L.'s legs over his shoulders, and "started licking [her] vagina." C.L. told Appellant that she did not like that and that she wanted him to leave her alone. Appellant told C.L. that she "seemed to like stuff inside of [her] more than outside," and Appellant got a "glass dildo." C.L. told Appellant that she did not want to use the dildo and that she wanted to go take a bath. Appellant said, "Come on. It's a waste of water. Just come take a shower with me." After the shower, C.L. slept in her own bed that night even though Appellant had "begged" her to "come spend the night with him."

In September, Jackie gave birth to the couple's second child. Jackie spent three days in the hospital. On one of those nights, Appellant and C.L. had dinner at home, and after dinner, Appellant asked if he could give C.L. a massage because

3

they "may not have a chance for a long time." Appellant told C.L. that Jackie had not been fulfilling him sexually since she became pregnant. After C.L. told Appellant three times that she did not want a massage, she ultimately acquiesced. C.L. testified that Appellant "did the normal massage stuff at first," and she clarified that she meant that Appellant massaged her back, touched her vaginal area with his mouth and fingers, and "put his fingers inside of [her]." Afterward, Appellant told her to take a shower with him; she did, and she also slept in Appellant's bed that night. C.L. wrapped herself in a blanket on Jackie's side of the bed before she went to sleep. However, when C.L. woke up, she was not wrapped in the blanket. Appellant had one hand inside her underwear touching her skin, and Appellant's other hand was moving under the blanket near his "penis area." C.L. asked Appellant what he was doing, and he pretended that he had been asleep. Appellant told C.L. that he and Jackie "had full sex sessions" and that he does "stuff like th[at] in [his] sleep all the time."

C.L. testified about another occasion when she and Appellant were lying on the bed in the master bedroom and Appellant said, "Nipples are so weird. You can punch them, and they get hard. You can lick them and they get soft." C.L. said that Appellant then "performed those acts." The last sexual encounter with Appellant that C.L. remembers occurred on an occasion when Jackie had left the house to pick up food. Appellant asked C.L. if she wanted a quick massage and told her to take off her shirt, and C.L. told him "no" because Jackie would not be gone long. C.L. testified that Appellant "let [her] go on that one and just massaged [her] breast and back, and then Jackie came home."

In January 2012, C.L. told her teacher about the abuse. After the teacher contacted authorities, C.L. was interviewed at the Child Advocacy Center, examined by a sexual assault nurse examiner (SANE), and returned to R.E.S.'s custody. Appellant gave a statement to the officers at The Colony Police

4

Department, and they obtained a search warrant. Several items described by C.L. were seized, including two dildos, shower sponges, lotion, and C.L.'s polka-dotted blanket that she put on the bed during a massage. The blanket had a floral scent that was consistent with the smell of the massage oil found in the home. The officers also took pictures and used an alternative light source that significantly enhanced images of bodily fluids. Lieutenant Darren Brockway testified that he saw more bodily fluid in Appellant's home than he would normally see. Officers seized the sheets on C.L.'s bed, the mattress cover from the bed in the master bedroom, and three couch cushion covers because the alternative light source indicated the presence of bodily fluids on those items. Testing revealed the presence of semen on the master bedroom mattress cover, but DNA testing showed that C.L. was excluded as a contributor.

In his first issue on appeal, Appellant contends that he was deprived of his constitutional right to effective assistance of counsel at trial. Appellant raises four grounds under this issue: (1) that trial counsel agreed to allow the State to amend the indictment shortly before trial, (2) that trial counsel failed to investigate and failed to present a defense, (3) that trial counsel failed to investigate the victim's prior allegation of sexual assault for which he had been acquitted, and (4) that trial counsel failed to challenge the testimony of the SANE.

The United States Constitution and the Texas constitution guarantee individuals the right to assistance of counsel in criminal prosecutions. U.S. CONST. Amend. VI; TEX. CONST. art. I, § 10. The right to counsel means more than simply having a lawyer present; it requires the right to effective assistance. *Lopez v. State*, 343 S.W.3d 137, 142 (Tex. Crim. App. 2011). A defendant does not have a right to errorless counsel but, rather, to objectively reasonable representation. *Id.* We review the totality of the representation and the circumstances of each case without

5

the benefit of hindsight. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006).

To determine whether trial counsel rendered ineffective assistance at trial, we look at whether Appellant has shown that the representation fell below an objective standard of reasonableness and, if so, whether Appellant has shown that there is a reasonable probability that the result would have been different but for trial counsel's errors. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). "Judicial scrutiny of counsel's performance must be highly deferential," and "counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 689, 690; *see also Tong v. State*, 25 S.W.3d 707, 712 (Tex. Crim. App. 2000). To properly and fairly assess trial counsel's performance, we reconstruct the circumstances of the challenged conduct, "evaluate the conduct from counsel's perspective at the time," and make every effort "to eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689. The failure to satisfy one prong negates a court's need to assess the other prong. *Id.* at 697; *Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009).

We first consider whether agreeing to the amended indictment shortly before trial falls below an objective standard of reasonableness. Appellant argues that trial counsel should have discussed the amendment with Appellant. Trial counsel testified at the hearing on the motion for new trial that he told Appellant "about the indictment and the motion to amend [the] indictment" and that he told Appellant that, in his opinion, the amended charges were "much better" for Appellant because the State had dropped "the charge of continuous sexual assault." Counsel testified, "At no time did [Appellant] tell me that, let's think about this and let's not agree to amending the information." Counsel further testified that he "would

6

have told the Court about his concerns" if Appellant had expressed any. Although Appellant testified that counsel did not tell him about the amendment until the day of trial, we defer to the trial court's resolution of conflicting testimony because the trial court is the sole judge of the credibility of the witnesses. *See Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001).

Appellant also argues that the amended indictment was more prejudicial and, thus, counsel should have objected to the amendment because the State alleged dates and acts in the original indictment "that they could not prove" and because Appellant faced two life sentences if found guilty on both counts of aggravated sexual assault. The State responds that "trial counsel fully explained why it was his sound trial strategy to allow the State to make the amendment" and that the record from the hearing "supports the trial court's implied findings that counsel did not perform deficiently."

The original indictment contained two counts. Appellant was first charged with the second-degree felony offense of indecency with a child by contact. *See* TEX. PENAL CODE ANN. § 21.11(a)(1) (West 2011). A second-degree felony offense of indecency with a child by contact is punishable by imprisonment for a term of not more than twenty years or less than two years and by a fine not to exceed $10,000. *Id.* §§ 12.33, 21.11(d). Appellant was also charged with the first-degree felony offense of continous sexual abuse of a child. *Id.* § 21.02 (West Supp. 2014). The State specifically alleged that Appellant had "commit[ted] two or more acts of sexual abuse, to-wit: Aggravated Sexual Assault and/or Indecency with a Child against [C.L.], on two or more occasions." A conviction for continuous sexual abuse of a child is punishable by imprisonment for life or for a term of not more than ninety-nine years or less than twenty-five years. *Id.* § 21.02(h). In addition, a defendant who is convicted of continuous sexual abuse

of a child is not eligible for release on parole. TEX. GOV'T CODE ANN. § 508.145(a) (West Supp. 2014).

The amended indictment contained three counts. In the first count, the State again charged Appellant with indecency with a child by contact but alleged that the offense occurred on December 1, 2011, instead of July 31, 2011, as originally alleged. The State dropped the allegation of continuous sexual abuse of a child and, instead, alleged two counts of aggravated sexual assault of a child. *See* PENAL § 22.021(a)(1)(B)(i), (iii). In the amended indictment, the State specifically alleged in count two that Appellant committed aggravated sexual assault by causing the penetration of the child's sexual organ with his finger and alleged in count three that Appellant committed aggravated sexual assault by causing the child's sexual organ to contact Appellant's mouth. Aggravated sexual assault is a first-degree felony offense that carries a potential punishment of imprisonment for life or for a term of not more than ninety-nine years or less than five years and a fine not to exceed $10,000. *Id.* §§ 12.32, 22.021(e).

Trial counsel testified that his decision to agree to the amendment was based on trial strategy. The only amendment that the State made to count one was to change the date of the alleged offense, and counsel explained that, because the State had used the phrase "on or about" in the original indictment, it did not have to prove the specific date originally alleged as long as the evidence showed that the offense occurred prior to the indictment. Indeed, it is well settled that, "when the State uses 'on or about' language and proves that the offense was committed on a date different from that alleged in the indictment, but before presentment of the indictment and expiration of the applicable statute of limitations, the offense took place 'on or about' the date alleged in the indictment." *Thomas v. State*, 444 S.W.3d 4, 9 (Tex. Crim. App. 2014). Accordingly, we must disagree with

8

Appellant's contention that the State originally alleged dates and facts in count one that it could not prove.

We must also disagree that the State alleged dates in the second count of the original indictment that it could not prove. In count two of the original indictment, the State alleged that two or more instances of sexual abuse had occurred between August 1, 2011, and October 31, 2011. In the amended indictment, the State alleged in count two that Appellant committed aggravated sexual assault on or about August 31, 2011, and alleged in count three that Appellant committed aggravated sexual assault on or about September 27, 2011. Thus, the dates alleged in counts two and three of the amended indictment fall within the range of the dates alleged in count two of the original indictment.

Similarly, there are no facts initially alleged in count two that the State was no longer required to prove. Based on count two of the original indictment, the State would have been required to prove that two instances of sexual abuse—either two instances of aggravated sexual assault, two instances of indecency with a child, or one instance of each—occurred from on or about August 1, 2011, through on or about October 31, 2011. *See* PENAL § 21.02(b). As amended, the State was required to prove that Appellant committed aggravated sexual assault on or about August 31, 2011, by causing the penetration of the child's sexual organ with Appellant's finger and that Appellant committed aggravated sexual assault on or about September 27, 2011, by causing the child's sexual organ to contact Appellant's mouth. *See id.* § 22.021(a)(1)(B)(i), (iii). We have compared the charges alleged in the original indictment with the offenses alleged in the amended indictment, and we must disagree that the original indictment was more favorable to Appellant.

Appellant also argues that the amended indictment was more prejudicial because Appellant faced two life sentences. Trial counsel, however, disagreed and

9

testified that the amended allegations were more beneficial for several reasons. First, if Appellant had been convicted of continuous sexual abuse, as initially alleged, there would have been a minimum sentence of imprisonment for twenty-five years and no opportunity for parole. Trial counsel testified that, in his experience with these kinds of cases in Denton County, Appellant would have been sentenced to life without parole if he had been convicted of continuous sexual abuse. Therefore, when the State offered to drop that allegation and, instead, alleged two counts of aggravated sexual assault, trial counsel believed that the amendment was in Appellant's best interest. Trial counsel believed that agreeing to the amendment was in Appellant's best interest because of the possibility of parole under the amended indictment and because the amended counts carried a minimum sentence of imprisonment for five years instead of the minimum twenty-five years for continuous sexual abuse. Additionally, counsel opined that it would be more difficult for the State to prove the two specific instances of aggravated sexual assault as alleged in the amended indictment because the jury would have to unanimously agree to each specific instance in order to find Appellant guilty, whereas the jury would not have to agree on the same two allegations to find Appellant guilty of continuous sexual abuse. For the offense of continuous sexual abuse, there could be a split among the jury but a guilty verdict nonetheless. According to trial counsel, the amended indictment clarified which of the child's allegations the State would have to prove.

Appellant offers no counter-argument to his trial counsel's strategy other than his opinion that such tactics could not constitute "any degree of strategy on the part of a competent criminal attorney." Trial counsel's strategy, however, was based on lower minimum sentences, the possibility of parole, and a more difficult case for the State to prove. There was clearly a plausible strategic basis for trial counsel's actions. *See Ex parte Burns*, 601 S.W.2d 370, 372 (Tex. Crim. App.

10

1980).  We will not use hindsight to second-guess trial counsel's trial strategy; the fact that another attorney might have pursued a different course does not render counsel's performance deficient.  *See Blott v. State*, 588 S.W.2d 588, 592 (Tex. Crim. App. 1979).

We next consider Appellant's complaints that trial counsel was deficient because he failed to investigate and failed to present a defense.  Appellant argues that trial counsel "presented no evidence, no witnesses and advised [Appellant] not to testify."  He also generally maintains that trial counsel failed to investigate prior allegations that C.L. had made against him and that trial counsel failed to interview potential witnesses who could have testified that C.L. "was a liar, or at the very least, had a selective memory regarding what happened when and how she had carefully crafted a set of facts for the jury to believe."

A criminal defense attorney "must have a firm command of the facts of the case as well as governing law before he can render reasonably effective assistance of counsel," which requires that counsel "seek out and interview potential witnesses."  *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990).  When we assess the reasonableness of an attorney's investigation, we must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further.  *Ex parte Martinez*, 195 S.W.3d 713, 721 (Tex. Crim. App. 2006) (citing *Wiggins v. Smith*, 539 U.S. 510, 527 (2003)).  "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. . . .  [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."  *Strickland*, 466 U.S. at 691.  "When challenging an attorney's failure to call a particular witness, an 'applicant must show that [the witness] had been available to testify and that his testimony would

have been of some benefit to the defense.'" *Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007) (alteration in original) (quoting *Ex parte White*, 160 S.W.3d 46, 52 (Tex. Crim. App. 2004)). Trial counsel's failure to present certain evidence is immaterial absent a showing that the evidence was available and that the evidence would have affected the outcome of the proceeding. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983).

The record from the hearing on Appellant's motion for new trial shows that C.L. had previously accused Appellant of sexual abuse in Dallas County and that Appellant had been acquitted of those charges. Appellant argued that his trial attorney "failed to investigate the prior allegations by failing to contact . . . the prior attorney for [Appellant] who had information regarding the prior false allegation." Counsel testified at the hearing, however, that he reviewed the pleadings from that case and considered the potential testimony on this issue before strategically deciding that he did not want to introduce that evidence at trial. Trial counsel determined that "any information about the prior trial of alleged sexual abuse of [C.L.] by [Appellant]" would have been "catastrophic" for the case. Counsel's "goal was to keep all reference[s] to the Dallas trial out of this trial," including any witness who wanted to discuss the issue, the victim's references in her statement that she had recanted those allegations, and Appellant's references to that case in his statement to police. Indeed, when Appellant's statement was published to the jury, the video was muted during any references to the Dallas trial. Counsel testified that, based on his discussion with the jury after the verdict, the jurors had confirmed his belief and had said that it "would have looked bad" for Appellant if they had known about the prior allegations. Moreover, there is no indication in the record as to what additional information counsel would have obtained from talking to Appellant's prior attorney.

As a part of his motion for new trial, Appellant offered the affidavits of Jackie; William Pierson, Jackie's brother-in-law; Barbara Pierson, Jackie's mother; and Mark Bussell, Appellant's friend. The record shows that trial counsel talked with Appellant, Jackie, and Barbara before trial. He also reviewed the State's file, including videotapes and audiotapes. Barbara and William submitted affidavits to trial counsel before trial, which show that they both would have testified that C.L. had admitted to them that she had lied when she accused Appellant of sexual abuse in the Dallas County case because "[her] Nanny told [her] to." Barbara also would have testified that she had observed C.L. "behave[ing] inappropriately towards her father and he would tell her no and not to try to get in his lap." Both Barbara and William would have testified that they never saw Appellant behave inappropriately toward C.L. Trial counsel explained that Barbara and William believed that they had provided information that would be helpful, but counsel disagreed and instead thought that this testimony "would have detracted from our case."

Trial counsel also testified that it was a strategic decision not to present alibi evidence because, in most cases involving multiple allegations of sexual abuse, defendants "focus on the date thinking that it's important" and "invariably" provide an alibi for that day, but counsel believed that the date is "really not important" because of the on or about language used in the indictment. William, Jackie, and Bussell each would have testified that they were with Appellant all day on the date that the State alleged in count one of the original indictment and that none of them had observed any inappropriate behavior that day. Jackie would have similarly testified as to the dates alleged in counts two and three of the amended indictment. Trial counsel specifically testified regarding Bussell's testimony about being with Appellant on July 31, 2011. Trial counsel explained, "[H]ow [Bussell] can prove that nothing happened on that day, in my mind, was a red herring and detracted from the case and made Mr. Bussell a marginal witness at

13

very best." Moreover, while it was initially alleged that the offense in count one occurred on or about July 31, 2011, the State amended the pleadings to allege that the offense instead occurred on or about December 1, 2011.

The affidavits offered by Appellant during the hearing on the motion for new trial show that there were witnesses who had been willing to testify at trial about C.L.'s inappropriate conduct. C.L. had told Barbara that she watched porn at her "Nanny's" house and that she lied about her age in order to play online games. C.L. told William that her aunt had "played with herself" and "touched her genitals" in front of C.L.; Barbara was also prepared to testify to that admission. William was also willing to testify that he thought that, on one occasion, he caught C.L. watching him change clothes. Jackie would have testified that C.L. "was a disciplinary problem" and had threatened to move in with her grandmother in Florida "with or without [Appellant's] permission." Trial counsel testified that he did not think that the testimony would add anything to the case. He told the witnesses that he did not call them to testify because the jurors would think Appellant's family members were lying to protect Appellant.

At the hearing on the motion for new trial, the State cross-examined Jackie about the certain periods of time that she was not at the home. Jackie admitted that, on one occasion, she left at midnight after fighting with Appellant and returned the next morning and that she was in the hospital for three days when she had a baby. The State argued that "quite frankly, whatever happened while you were in the hospital, you would not have really any firsthand knowledge of what happened back at your house" and pointed out that "the State doesn't have to prove an exact date" that was alleged in the indictment. The State also established bias by eliciting testimony on cross-examination that Jackie and the children had been living on their savings while Appellant was in jail and that she was "currently looking for work."

After trial counsel reviewed Appellant's statement to the police, he was of the opinion that Appellant would not make a good witness. Trial counsel testified that he was also concerned that the State might elicit damaging facts on cross-examination that had not been introduced at trial. When asked why he did not call any witnesses, counsel said, "If you call a witness to the stand, oftentimes they can affirm a position that the State is trying to [prove]; and I think that would have occurred in this case." Trial counsel testified that his "general theory is not to help the State prove its case."

Trial counsel did call the forensic DNA analyst who testified that C.L. was not a contributor to the DNA found on the master bedroom mattress cover. Counsel testified that he did not believe that there were other potential witnesses who had relevant information that would help the case and, instead, just attacked the State's case. The theme of the defense's case was to show that C.L. had manipulated people so that she could move in with her father and that, when C.L. changed her mind and wanted to return to her grandmother, she again used manipulation. Counsel introduced this theme to the jury during voir dire and maintained the theme throughout opening statements, cross-examination of witnesses, and closing arguments. The State addressed this theme during its closing arguments as well.

During the trial, the State sought to introduce a forensic interview of C.L. that was conducted at the Child Advocacy Center. Appellant objected that the interview was hearsay and presented case law in support of his position. The State argued that the exhibit was a prior inconsistent statement. Trial counsel explained that he did not want the interview admitted because he thought C.L. was defensive in her testimony at trial and wanted that to be the jury's impression of her rather than the impression left in the interview during which she had not been "challenged in any way or cross-examined at the time." After a bench conference,

the State "withdrew the evidence or never pursued it." Trial counsel considered this to be a small victory for the defense.

The lengthy record in this case shows an able defense of a client who was identified by his daughter as committing several acts of sexual abuse over a certain period of time. Although she varied in her description of the location and the timeline of some of the events, C.L. testified to the same facts at trial that she initially told the SANE. Counsel emphasized the inconsistencies in location and time between C.L.'s initial report and her testimony at trial, and counsel directed the jury to facts that C.L. testified to for the first time at trial. Moreover, counsel argued that several facts that C.L. testified to did not make sense and maintained that the State failed to carry its burden in this case. The record shows appropriate pretrial motions, appropriate opening and closing statements, and vigorous cross-examination of the State's witnesses.

We have carefully examined the arguments, the evidence, and trial counsel's explanations at the hearing on the motion for new trial. Because the record shows that Appellant's trial counsel reviewed the facts of the prior trial and the potential evidence on that issue and considered whether to present such evidence in the present trial, we disagree with Appellant that counsel failed to investigate the prior allegations. Additionally, nothing in the record demonstrates that counsel's representation at trial was the product of an unreasonable strategy or shows how, if at all, the outcome of the proceeding would have been different absent the alleged deficiencies. *See Ex parte Flores*, 387 S.W.3d 626, 638 (Tex. Crim. App. 2012). Based on the totality of the representation and the circumstances present in this case, we cannot conclude that the record reveals deficient performance sufficient to overcome the presumption that the representation fell within the range of reasonable professional assistance. *See Strickland*, 466 U.S. at 687–89.

16

We next address Appellant's complaint that trial counsel failed to investigate or rebut what Appellant characterizes as false testimony by the SANE. Appellant argues that SANE Lucrecia DeLawter, who claimed to be relying on a 2007 study by Nancy Kellogg, "testified that 96% of the time there are no signs of penetration in a sexual assault case." Appellant asserts that it was, instead, a 2004 study and that it "showed that 36% of the females in Dr. Kellogg's study did not have normal findings." Appellant directs us to the website for the Journal of the American Academy of Pediatrics where the study can be found.

In her testimony, DeLawter did not connect the statistic cited by Appellant to any particular study but stated that this information was based on "current literature." DeLawter testified that the Kellogg study was based on thirty-six pregnant adolescent females and that "only two of those thirty-six had any diagnostic findings of penetration." The State included the Kellogg study as part of the appendix to its brief, and to support its argument that the testimony was supported by the study, the State quotes a finding that, "[d]espite definitive evidence of sexual contact (pregnancy), only 2 of 36 adolescents had genital changes that were diagnostic of penetrating trauma."

The Kellogg study, however, is not part of the trial record. And, because this ground was not asserted in the motion for new trial, there was no evidence in the record demonstrating the truth or falsity of DeLawter's statements. From the record before us, we do not know that the testimony was false, nor does the record demonstrate that another expert would have testified differently on rebuttal. Consequently, we conclude that Appellant has failed to show that counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687–88.

Appellant additionally argues that trial counsel was ineffective during plea negotiations. Specifically, Appellant contends that he "was never informed of

what he was facing if he went to trial thus he could not make an informed decision about any plea negotiations." The right to effective assistance of counsel applies to plea negotiations. *Lafler v. Cooper*, 132 S.Ct. 1376, 1384 (2012). To establish prejudice in an ineffective-assistance claim in which the accused rejects a plea bargain because of bad legal advice, the accused "must show a reasonable probability that: (1) he would have accepted the earlier offer if counsel had not given ineffective assistance; (2) the prosecution would not have withdrawn the offer; and (3) the trial court would not have refused to accept the plea bargain." *Ex parte Argent*, 393 S.W.3d 781, 784 (Tex. Crim. App. 2013).

The record shows that Appellant rejected a plea offer of fifteen years. At the time of the plea offer, the indictment had not yet been amended to delete the allegation of continuous sexual abuse. Therefore, as discussed previously, Appellant faced a maximum punishment of confinement for twenty years if convicted in count one and of confinement for life or up to ninety-nine years if convicted in count two. Counsel testified at the hearing on the motion for new trial that he advised Appellant of the charges and of the range of punishment and that he told Appellant that "it was going to be a long sentence if they found him guilty." Further, because continuous sexual abuse "was still on the table," trial counsel warned Appellant that "he would get no parole."

Appellant testified that trial counsel had discussed the range of punishment but not the parole issue. Even if we were to assume that counsel did not inform Appellant that he would be ineligible for parole, there is no evidence in the record showing that Appellant would have accepted the plea offer if he had been advised of his ineligibility for parole. *See id.* Appellant has not shown that he was denied the right to effective assistance of counsel. *See Strickland*, 466 U.S. at 687. Appellant's first issue is overruled.

In his second issue, Appellant complains that the trial court erred when it admitted the report of DeLawter over his hearsay objection and that C.L.'s statements to DeLawter did not satisfy the exception for statements made for the purpose of medical diagnosis or treatment because they were made for the purpose of a criminal investigation. "Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment" are not excluded by the hearsay rule. TEX. R. EVID. 803(4).

In order to preserve error for appellate review, a party must object each time the inadmissible evidence is offered. *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991). When the State offered the report, Appellant objected to the report as hearsay, and the trial court overruled the objection. When the State subsequently asked DeLawter to read C.L.'s statements that she made to her and that were contained in her report, Appellant objected. The State asked DeLawter to summarize what C.L. had told DeLawter, and DeLawter testified that C.L. reported "a history of penetration to her female sexual organ with [Appellant's] mouth, tongue and fingers" and that Appellant had given her massages and asked her to take off her clothes. According to DeLawter, C.L. had also reported that Appellant had checked C.L.'s genitalia "to see if she was keeping herself pretty clean" and had "stuck a finger in her, and then when he took it out he licked his finger and said that 'You taste so good. You must be keeping it pretty clean.'" DeLawter also testified that C.L. reported that Appellant had told C.L. that "she should probably start to shave down there to keep herself clean" and that, when C.L.'s breasts were aching and causing discomfort from maturing, Appellant massaged her breasts. Appellant warned C.L. not to say anything "because Jackie would overreact."

19

Appellant twice objected to DeLawter reading from the report. Appellant did not, however, object to DeLawter's testimony in which she summarized C.L.'s statements, did not object when the State published copies of the report to the jury members, and did not request a running objection. Because Appellant failed to object each time the statements were offered into evidence, he has not preserved error regarding any of these statements. *See Hudson v. State*, 675 S.W.2d 507, 511 (Tex. Crim. App. 1984) ("an error in admission of evidence is cured where the same evidence comes in elsewhere without objection"); *see also Valle v. State*, 109 S.W.3d 500, 509–10 (Tex. Crim. App. 2003).

Appellant did preserve error as to other statements reflected in the report that DeLawter did not summarize. These statements related to massages, sex toys, showering together, waking up with Appellant's hands inside her panties, and a sexual assault at Appellant's office. Even if we assume that these statements to DeLawter were not made for the purpose of medical diagnosis or treatment and that the trial court erred when it admitted the statements, the error was harmless because C.L. told the jury the same facts that she had previously told DeLawter, and that testimony was not hearsay. *See Taylor v. State*, 268 S.W.3d 571, 592–93 (Tex. Crim. App. 2008).

Appellant also complains in his second issue that the trial court erred in allowing a copy of DeLawter's report to be substituted for the copy that had been admitted as the original exhibit. The record shows that the original Exhibit No. 1 had apparently been misplaced and that, prior to resting its case, the State asked that a copy be substituted for the missing exhibit. The record shows that, upon admission of the exhibit during DeLawter's testimony, the trial court permitted the State to make twelve copies of the exhibit and publish them to the jury. Thus, each juror had been given a copy of the original exhibit. Contrary to Appellant's assertion, there is nothing in the record to indicate that the substituted exhibit was

20

not an exact duplicate of the original exhibit, that the best evidence rule was violated, or that the substitution violated Appellant's rights to due process. Appellant's second issue is overruled.

We affirm the judgment of the trial court.


JIM R. WRIGHT

CHIEF JUSTICE


March 20, 2015

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.

Joseph Levy 01833936
Clements Unit
9601 Spur 591
Amarillo, Tx 79107

Eleventh Court of Appeals
100 West Main Street #300
Eastland, Tx 76448